(110 So. 626)

No. 28068.

### STATE v. BUSSEY.

(Nov. 2, 1926. Rehearing Denied Nov. 29, 1926.)

*(Syllabus by Editorial Staff.)*

1. **Criminal law ⊚⟹662(1)—Ex parte declarations are generally inadmissible against accused (Const. art. 1, § 9).**

Generally, proof of ex parte declarations is inadmissible, and, as to criminal prosecutions, rule is written in Const. art. 1, § 9, guaranteeing accused right to be confronted with witnesses against him.

2. **Witnesses ⊚⟹37(1), 227, 266—Witness can testify only to what he knows, and only when under oath and subject to cross-examination.**

Witness can testify only as to what is within his own knowledge, and only when under oath and subject to cross-examination.

3. **Criminal law ⊚⟹368(1)—Ex parte declaration is admissible to explain principal transaction, if part of "res gestæ."**

Proof of ex parte declaration is admissible in explanation of principal transaction under in-

vestigation, if so closely related thereto as to form part of "res gestæ," meaning thing done or transaction or occurrence being investigated.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Res Gestæ.]

4. **Criminal law ⊚⟹366(3)—Victim's exclamations, during or immediately after crime, in excitement of occasion, are generally part of res gestæ.**

Exclamations by victim, during or immediately after commission of crime, in excitement of occasion, are generally regarded as part of res gestæ.

5. **Criminal law ⊚⟹366(6)—Time between crime and victim's utterance is important in determining whether latter was part of res gestæ.**

Time elapsing from moment of commission of crime to that of utterance by victim is important in determining whether excitement of occasion continued without interruption until moment of utterance, and so influenced it as to make it spontaneous and unreasoned expression, constituting part of res gestæ.

6. **Criminal law ⊚⟹366(1)—Victim's statement after crime is not res gestæ, unless spontaneous, unreasoned, and induced by excitement or suffering caused by crime.**

Unless statement by victim after crime was spontaneous, unreasoned, and superinduced by excitement or suffering caused by crime itself, it is not part of res gestæ.

7. **Criminal law ⊚⟹366(6)—Child's statements, 28 hours after alleged poisoning by bichloride of mercury, that defendant made her eat soap on toast, held not res gestæ.**

In trial for murdering 5 year old girl by administering bichloride of mercury, child's calm and deliberate statements to nurses, in response to questions in ordinary conversation, 28 hours after alleged crime, that defendant made her eat soap on toast bread *held* not admissible as part of res gestæ.

8. **Criminal law ⊚⟹367—Term "res gestæ" should not be more liberally applied in considering declarations of one poisoned, than of sufferer from gunshot wound or other bodily injury.**

No more liberal application should be given term "res gestæ" in considering admissibility of declarations of person suffering from effects of poison, than of one suffering from gunshot wound or other bodily injury.

**9. Criminal law  ⊚⟶366(4)—Child victim's declarations that defendant made her eat soap on toast held inadmissible, even if part of res gestæ, in trial for murder by administering bichloride of mercury, in absence of other proof thereof.**

Child's declarations to nurses that defendant made her eat soap on toast *held* inadmissible in trial for murdering her by administering bichloride of mercury, even if part of res gestæ, in absence of other evidence that defendant or any one administered poison, or that it was administered willfully or with criminal intent; such declarations not being merely part of, or explanatory of res gestæ, but the only proof thereof.

Appeal from Criminal District Court, Parish of Orleans; N. E. Humphrey, Judge.

Mrs. Renette Bussey was convicted of manslaughter, and she appeals. Verdict and sentence annulled, and case remanded.

Hugh M. Wilkinson and A. Miles Coe, both of New Orleans, for appellant.

Percy Saint, Atty. Gen., E. R. Schowalter, Asst. Atty. Gen., and Henry Mooney, Dist. Atty., and Eugene Stanley, Asst. Dist. Atty., both of New Orleans, for the State.

O'NIELL, C. J. The defendant, appellant, was prosecuted for murder, convicted of manslaughter, and sentenced to imprisonment in the penitentiary for a term not less than 10 nor more than 15 years. The accusation, specifically, was that she had willfully poisoned her child, Verdia Bussey, a girl 5 years of age. The child died under suspicious circumstances, and her death was attributed to mercuric chloride poisoning.

The only question that was argued, either orally or in the printed briefs, is whether the testimony of two nurses, namely, Mrs. Gremillion and Miss Trice, who, as witnesses for the state, related a conversation which each of them had with the child in the Charity Hospital, was objectionable as hearsay evidence or admissible as a part of the res gestæ. The child was brought to the hospital by the mother about 5:30 o'clock on Friday evening, the 12th of February, 1926, and remained there under the care and observation of the nurses and under treatment by the physicians until her death, which occurred on the 21st of February, 1926. The conversation which Mrs. Gremillion said she had with the child was said to have taken place about 8:30 o'clock on Saturday night, the 13th of February, and the conversation which Miss Trice said she had with the child was said to have taken place on the same night and soon after Mrs. Gremillion's conversation with the child. Neither nurse heard the other's conversation with the child. It is conceded that it was not possible for the poison to have been administered after the child was admitted to the hospital. The theory of the prosecuting attorneys is that the poison was administered not long before the child was brought to the hospital; that is, some time longer than 28 hours before the conversation was had with Mrs. Gremillion.

Both nurses were acquainted with the child because she had been in the hospital twice before. She was there in November, 1925, and was then examined for diphtheria and treated for laryngitis. She was there again in January, 1926, and her trouble was then diagnosed as chronic pulmonary tuberculosis, and she was discharged on the 19th of January, 1926.

The declarations which the child is said to have made to the nurses were not in the nature of spontaneous outcries or complaints of suffering. They were described in each instance, as calm and deliberate statements, made in response to questions, in an ordinary conversation. Mrs. Gremillion testified that she was on night duty, from 7:30 p. m. to 7:30 a. m.; that she did not speak to the child on Friday night, the 12th of February, but spoke to her on the next night. The witness then testified as follows, in response to the questions propounded by one of the prosecuting attorneys, viz.:

"Q. You did not go to the bed the first night? A. No; I did not. I just went into the ward and greeted my patients, and just asked how was everybody.

"Q. Did you go to the ward the second night? A. Yes, sir.

"Q. Did you speak to this child the second night? A. Yes, sir; I did.

"Q. What did you say to the child, and what did the child say to you?"

Here the defendant's attorneys objected to the evidence on the ground that it was hearsay; the prosecuting attorneys argued that it was admissible as a part of the res gestæ; and the judge so ruled. The court then went into recess; and after recess the examination of the witness was proceeded with, as follows:

"Q. I asked you before recess, before objection was made and argument had on the objection, what your conversation was—what you said to this child, and what the child said to you—on the night that you spoke to the child in the Charity Hospital? A. Well, when I went into the ward I greeted my patients, and I walked over to Verdia Bussey's bedside, and I asked her, I says, 'Honey, why were you brought here?' And she says, 'I'm sick.' I says, 'Well, listen, what did you eat this time?' She says, 'My mother made me eat soap on toast bread.'

"Q. What else did she say? A. And so I asked her, 'Soap on toast bread?' She says, 'Yes; it was nasty.' I said, 'Have you said anything to the doctors about this?' She said, 'No; mother would whip me.' "

On cross-examination, the witness added that the child said that her mother said that the doctor said that soap on toast bread was good for the child's stomach, viz.:

"Q. You walked right up to her and said to her, 'Honey, what made you sick?' A. Yes, sir.

"Q. That was the first thing you said to her? A. Yes, sir.

"Q. And the first thing she said to you was, 'Mother made me eat soap on toast bread.' A. Yes, sir.

"Q. And you repeated it back to her, 'Mother made me eat toast bread with soap on it?' A. Yes, sir; and she answered, 'It was nasty.' She said, 'Mother made me eat soap on toast bread,' and said the doctor said it was good for her stomach."

Miss Trice, in her testimony, also described the child's declarations as calm and deliberate statements. In response to the questions propounded by one of the prosecuting attorneys, the witness testified as follows:

"Q. Miss Trice, did you know this child? A. I had seen her before.

"Q. She had been in the hospital before? A. Yes, sir.

"Q. What conversation did you have with her on the night of the 13th of February, yourself? A. I asked her what she had eaten..

"Q. Why did you ask her that question? A. She told me on the previous occasion when she had been in the hospital—

"Q. Don't state what happened on the previous occasion. On this particular night you saw her in the hospital? A. Yes.

"Q. You spoke to her? A. Yes, sir.

"Q. Why did you ask her what she was suffering from?"

Here an objection was made by the defendant's attorney, and overruled, after which the examination was proceeded with:

"Q. Well, you did ask her? A. Yes.

"Q. What did she answer? A. She said her mother gave her soap on toast bread.

"Q. Did she say anything else? A. She said she vomited blood.

"Q. Was she vomiting then? A. Very little then; she did vomit later.

"Q. Did she say when this occurred? A. What's that?

"Q. About the giving of the soap on bread? A. I don't understand that question.

"Q. Did she say when her mother gave her that soap on bread before she came into the hospital—did she say anything? A. I asked her why she ate it, and she said it was nasty, but she ate it because her mother said the doctor said it was good for her stomach."

Both witnesses said that they never mentioned to Mrs. Bussey the child's statements to them that her mother had made her eat soap on toast bread, etc., notwithstanding Mrs. Bussey visited the child frequently after the conversations, and both witnesses knew her well. They reported their conversations with the child to the doctor in charge of the case, and the matter was in turn reported to the coroner, but it was not men-

tioned to Mrs. Bussey during the lifetime of the child.

There was no testimony whatever except that of Mrs. Gremillion and of Miss Trice tending to prove that the defendant or any other particular individual had administered poison to the child and no proof that the poison was administered willfully or intentionally. Aside from the testimony of Mrs. Gremillion and Miss Trice, the proof was merely that the child died as a result of being poisoned with bichloride of mercury, and that, when the child was brought to the hospital by the defendant the illness was diagnosed as a case of metallic poisoning.

[1, 2] The general rule, of course, is that proof of ex parte declarations is not admissible in evidence. The fundamental reason for the rule is that, in judicial proceedings, a witness can testify only to what is within his own knowledge, and only when under oath and subject to cross-examination. Chamberlayne on the Modern Law of Evidence, vol. 4, No. 2998. As to criminal prosecutions, the rule is written in the Constitution, in the Bill of Rights, in the guaranty (in article I, section 9), that the accused, in every instance, shall have the right to be confronted with the witnesses against him.

[3-6] An exception to the rule forbidding hearsay testimony is that proof of an ex parte declaration is admissible in explanation of the principal transaction under investigation if the declaration was so closely related to it as to form a part of the res gestæ—meaning, literally, the thing done—or the transaction, or occurrence itself which is being investigated. There is no hard and fast rule for determining when a declaration is and when it is not to be deemed a part of the res gestæ. Exclamations made by the victim during or immediately after the commission of a crime, and in the excitement of the occasion, are generally regarded as a part of the res gestæ. As to expressions uttered after the crime

was committed, the time that has elapsed from the moment of the commission of the crime to the moment of the utterance is important in determining whether the excitement of the occasion continued without interruption until the moment of the utterance and so influenced it as to make it a spontaneous and unreasoned expression and therefore a part of the res gestæ—or of what was done in the commission of the crime itself. Unless the expression was a spontaneous and unreasoned expression, superinduced by the excitement or suffering caused by the crime, itself, it is not a part of the res gestæ.

[7, 8] The declarations said to have been made by Verdia Bussey to the two nurses who attended to her in the Charity Hospital were made at least 28 hours after the crime was committed, if, in fact, a crime was committed. It is not contended that the declarations were exclamations provoked by excitement, or even complaints of suffering or spontaneous outcries. They were, as we have said, calm and deliberate statements made in response to questions, in an ordinary conversation. There is no authority in the jurisprudence of this court, or of any other court, as far as we know, nor sanction in the opinion of any text-writer on the law of evidence, for the admission of such a declaration in evidence as a part of the res gestæ. In Chamberlayne on the Modern Law of Evidence, vol. 4, No. 3032, it is said that a more liberal application is given to the term res gestæ in admitting in evidence statements made by the victim of a homicide committed by poisoning, and that in such cases the prosecution is permitted, in some jurisdictions, to prove practically everything said by the person poisoned, regarding the administration and effect of the poison, from the time it was administered until death ensued. In the cases cited there, however, to show the liberality of the rule in cases of poisoning, the declarations of the person or persons

poisoned were made during or immediately after the taking of the poison or were super-induced either by the excitement of the occasion or by the suffering caused by the poison. And the eminent author ends that section of his work with the statement:

"From this extreme view there is, however, a vigorous dissent" (citing decisions by the highest court in Alabama, Colorado, Kentucky, Mississippi and South Dakota, and the Texas Court of Criminal Appeals).

No reason is suggested why a more liberal application should be given to the term "res gestæ" in considering declarations made by a person suffering from the effects of poison than in considering the declarations of a person suffering from a gunshot wound or other bodily injury.

[9] If the declarations made by Verdia Bussey to Mrs. Gremillion and Miss Trice were a part of the res gestæ, they were the only part of the res gestæ that was proved at all. It is conceded that there was no other evidence that the defendant or any other individual administered the poison, and no other evidence that it was administered willfully or with criminal intent, except the inference that might be drawn from the child's statement that her mother made her eat soap on toast bread—the inference, of course, being that the mother made the child eat bichloride of mercury on toast bread, because it was bichloride of mercury in the system that caused the child's death. It is stated in the bill of exceptions, taken to the overruling of the defendant's objection to the testimony of Mrs. Gremillion and of Miss Trice, that no other evidence was offered, "circumstantial or otherwise, from which administration of poison by the defendant might be inferred." It is admitted that the only other evidence of the commission of the crime charged consisted of the testimony of physicians, chemists and other experts, to prove the ante mortem symptoms and clinical history of the case and the post mortem showing that mercury in the system was the cause of death. The declarations said to have been made by the child to Mrs. Gremillion and Miss Trice were offered in evidence, therefore, not merely as a part of or explanatory of the res gestæ, but as the only proof of the res gestæ. It is said in 22 C. J. p. 449, No. 536:

"It is proceeding in a circle to use the declarations as proof of facts necessary to constitute the declarations part of the res gestæ."

The case cited there in support of the proposition is State v. Williams, 108 La. 222, 32 So. 402, the decision in which, by the late Chief Justice Nicholls, well sustains the proposition that there must be some other proof of the res gestæ before the ex parte declarations of the injured person can be admitted in evidence as a part or in explanation of the res gestæ. Here is what the court said:

"On trial of a party charged with murder, the unsworn statements of the party alleged to have been killed are admissible in evidence only in exceptional cases. Before they are introduced, the district attorney should establish the state of facts making them admissible. Where they are sought to be introduced as part of the res gestæ, the facts going to make them such should be established by testimony of parties cognizant of them. The admissibility of the statements themselves being the very issue for decision, no part of them can be used as furnishing the basis and foundation on which they are to be admitted."

Our conclusion is that the ruling in this case, allowing the two nurses to testify to what the child said to them in the hospital, was wrong, and that the verdict and sentence must therefore be annulled. It is not necessary to discuss the two other bills of exception in the record, which were not discussed either in the argument of the case or in the briefs that were filed.

The defendant stands acquitted of the crime of murder. Whether she should be tried again for manslaughter, for the death of the child, considering her infancy and the cause of her death, is a matter to be deter-

mined primarily by the district attorney and the criminal district court.

The verdict and sentence are annulled, and the case is remanded to the criminal district court for such further proceedings as may be deemed appropriate, consistent with the foregoing opinion.